IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 18, 2013

**STATE OF TENNESSEE v. LATONYA DEON DALTON**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-C-2084    Monte Watkins, Judge**

**No. M2012-01240-CCA-R3-CD - Filed July 22, 2013**

Upon her indictment for six counts of aggravated child abuse and six counts of aggravated child neglect, the defendant, Latonya Deon Dalton, pled guilty to two counts of attempted aggravated child abuse, a Class B felony. In exchange for her pleas, the defendant received concurrent, ten-year sentences as a Range III offender, with the manner of service to be determined by the trial court. After a sentencing hearing, the court ordered that the defendant serve one year in confinement, followed by probation for the remaining balance of the agreed-upon sentence. On appeal, the defendant argues that the trial court failed to "give due consideration" to the principles of sentencing and also failed to give her nearly four months of jail credit. Following our review, we affirm the sentence imposed by the trial court. However, we remand for the trial court to determine the amount of jail credit to which the defendant is entitled and apply that toward the one-year portion of her sentence to be served in confinement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Latonya Deon Dalton.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

A transcript of the plea hearing is not included in the record on appeal from which we can glean the underlying facts of the offenses. However, at the defendant's sentencing hearing, Pete Streiff, a child protective services investigator with the Department of Children's Services, testified that he began his investigation of the defendant after he received a referral on January 4, 2011, concerning physical abuse of a child. The referral stated that seven-year-old K.D.[1] had a mark on his face below his right eye, and he had told someone that his mother, the defendant, had hit him with a shoe. Streiff spoke to K.D. at his school on January 6, and K.D. said that he received the injury while playing leapfrog with his brother, M.D. However, Streiff spoke with school staff and learned that K.D. "had given them multiple explanations for the injury." K.D. denied having any marks or injuries on other parts of his body.

After he talked to K.D., Streiff attempted to contact the defendant. He attempted to reach her by phone several times and sent her a letter, but he did not physically meet with her until March 4 in her home. The defendant told Streiff that she disciplined her children by "putting them in the room and by giving them extra chores and by spanking them on the bottom."

Following his meeting with the defendant, Streiff returned to the elementary school to do a follow-up with the defendant's three children who attended school there. When he asked the children about discipline in their home, K.D. said, "Mom spanks us on the bottom with a belt." His brother, M.D. blurted out, "And on the back." Streiff asked M.D. if he could see his back, and M.D. lifted his shirt. M.D. had scratches on his back and a significant scabbed mark that looked like a "belt looped." M.D. reported that the defendant had spanked him on the back with a belt. Streiff asked K.D. if he had any marks like his brother, and K.D. pulled up his shirt to reveal fairly new marks on his shoulder area.

After speaking with the children, Streiff returned to the defendant's home and spoke with her briefly in the front yard. He told the defendant that he had just seen her children and that they had marks on them. The defendant told him that her four-year-old nephew liked to play with belts and swing belts around, and that was perhaps how her children got the marks. Streiff told the defendant that the mark on M.D.'s back looked "pretty dated," which would have meant the nephew "would have been even younger when this most likely happened." He mentioned to the defendant that the marks on K.D.'s arm "looked pretty fresh," and the defendant said that she had not seen them but that they probably came from their pet pit bull dog, her nephew, or K.D. himself. Streiff said to the defendant, "No child is going to sit there and let a two- or three-year-old hit them with a belt like that . . . is it

---

[1]It is the policy of this court to refer to minor victims by their initials.

possible you did it?" The defendant replied, "It is possible."

The children were removed from the defendant's home on March 5 and placed in a safety placement. The juvenile court made an adjudication that the children were abused or neglected. Three of the children were placed with a grandmother, and one child was placed with a grandfather. The children never resided in the defendant's home again. Streiff was shown a series of photographs taken of the children on March 10 and determined that the injuries shown in the photographs were consistent with his observations of the children on March 4 and 5.

Streiff testified that there had been five prior investigations of the defendant, four of which involved allegations of physical abuse. None of the allegations were ever indicted or adjudicated. Services were recommended in one of the prior investigations, one that involved a significant mark on K.D.'s head. However, the investigator could not prove that the defendant was responsible and the defendant did not admit responsibility. All of the prior referrals would have been prompted because someone observed injuries on the children. The defendant would have been interviewed as a result of the investigations and would have been aware that she was being investigated concerning allegations of physical abuse or neglect.

Detective Jacob Pilarski, a detective for youth services, testified that K.D. was eight years old and M.D. was six years old at the time of his investigation. He personally interviewed both brothers on March 10 at the elementary school and later observed a forensic interview that was conducted of the brothers at the child advocacy center. Detective Pilarski identified two sets of photographs. One set of photographs was taken of K.D. on March 5 when the children were removed from the home, and the other set of photographs was taken of M.D. on March 10 at the school.

When Detective Pilarski interviewed K.D. on March 10, K.D. told him that he had sustained the injuries to his body by being "struck with objects by his mother," and he described the objects to the detective. One instrument was a sharp belt with "some kind of teeth on it," which K.D. said "hurt very bad." During that interview, K.D. told Detective Pilarski that the belt had gotten thrown into the dumpster. Later, during the forensic interview, K.D. said that he threw the belt away because it hurt. In Detective Pilarski's personal interview with K.D. on March 10, K.D. described being hit with "a cord that plugs into the TV." In the forensic interview, K.D. again described a cord that plugged into the TV and drew a picture of a long black cord with a red, yellow, and white end on it. Detective Pilarski recognized it as an RCA jack, used to connect a VCR or other cable equipment to a TV. During both interviews, K.D. talked about the cord being plugged into the TV. Several RCA jacks were recovered from the defendant's home.

Detective Pilarski testified that the photographs of K.D.'s injuries demonstrated multiple injuries sustained over a period of time. Some scars overlapped and some injuries were still scabbed, indicating that those injuries were newer. There were multiple different scars all over his back and on his arms. Some scars corresponded with the instruments that K.D. had described. For example, some of the scarring was consistent with a looped cord instrument, and one specific scar resembled a belt buckle. During Detective Pilarski's interview with M.D. on March 10, M.D. described being struck by his mother with the same belt and cords that K.D. had described. Both brothers reported that they had witnessed each other being spanked or whipped.

Detective Pilarski testified concerning his attempts to interview the defendant about her sons' injuries. On one occasion, he called her to arrange a time to speak with her, and she said that "she [had] already g[iven] an interview to DCS, and that was all she was saying and that she was retaining counsel." During the execution of a search warrant of the defendant's home, the detective left his business card with the defendant, saying she could contact him if she ever wanted to speak with him, but that was the extent of any of their conversations.

In an allocution to the court, the defendant apologized to her children and family for anything she put them through. She reported that she was currently attending cosmetology school and hoped to go into massage therapy and esthetics. She planned to own her own business and "work full time to be a salon barber, master barber." The defendant said that she loved her children and cared for them, always ensuring that they had food, clothes, and a house to live in. She planned to start visiting them as soon as possible and eventually regain custody of them. She said that she had mental health issues and had been seeing mental health professionals for ten or eleven years. Her medications had been changed on and off due to various side effects. She claimed that interactions between Seroquel and Depakote had caused her to gain weight, caused her blood pressure to rise, and made her "unable to be stable with [her] children with stress and everything, like getting sick all the time."

The defense submitted a synopsis of the defendant's mental health records from Mental Health Co-op into evidence. The defense also submitted a court order from the juvenile court concerning the defendant's visitation with her children, as well as copies of the defendant's school records. The State introduced the defendant's presentence report into evidence.

## ANALYSIS

The State initially argues that the defendant has waived her claim because she failed

to include a transcript of the guilty plea hearing or the presentence report in the record on appeal. We will, however, review the defendant's claim as we determine that the record is sufficient for a meaningful appellate review of the defendant's issue.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. In State v. Caudle, our supreme court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

Presumably disputing the trial court's not granting a fully probated sentence, the defendant asserts that the trial court failed to "give due consideration" to the principles of sentencing.

It is clear from the discussion at sentencing that the court was aware of the factors it was to consider in determining the defendant's sentence. The trial court was particularly concerned with the circumstances of the offense – the extreme abuse the defendant inflicted on her children. The record of the sentencing hearing includes photographs of the injuries suffered by her children, as well as evidence concerning the defendant's social history and physical and mental condition. The court apparently found that the defendant had some potential for rehabilitation, given it probated ninety percent of her sentence.

In sentencing the defendant, the trial court stated:

I have considered all matters in this particular case. And you know, the fact that a person has mental issues and is receiving mental treatment does not excuse abusive behavior in any respect, particularly when it comes to children. There is just no excuse for that. These children were abused extremely. And when you do that, you have to pay some price for it.

The Court has considered all of these things.

She pled to two counts of attempted aggravated child abuse. Ten years at forty-five percent. These sentences will run concurrently. But she will serve until May 31st of 2013, and then begin nine years of probation. And then we'll see what she does from that point.

After review, we conclude that the defendant has not shown that the trial court abused its discretion in not granting her a fully probated sentence.

With regard to the defendant's jail credit, Tennessee Code Annotated section 40-23-101(c) provides as follows:

The trial court shall, at the time the sentence is imposed and the defendant is committed to jail, the workhouse or the state penitentiary for imprisonment, render the judgment of the court so as to allow the defendant

-7-

credit on the sentence for any period of time for which the defendant was committed and held in the city jail or juvenile court detention prior to waiver of juvenile court jurisdiction, or county jail or workhouse, pending arraignment and trial. The defendant shall also receive credit on the sentence for the time served in the jail, workhouse or penitentiary subsequent to any conviction arising out of the original offense for which the defendant was tried.

When time spent in jail "arises out of" an offense, pretrial jail credit is "a matter of right." Trigg v. State, 523 S.W.2d 375, 376 (Tenn. Crim. App. 1975). The primary purpose of awarding pretrial jail credit is to prevent discrimination against indigent defendants who are unable to make bond prior and subsequently to conviction, unlike their counterparts with the financial means to obtain a bond. See State v. Watkins, 972 S.W.2d 703, 705 (Tenn. Crim. App. 1998); State v. Silva, 680 S.W.2d 485, 486 (Tenn. Crim. App. 1984); State v. Abernathy, 649 S.W.2d 285, 286 (Tenn. Crim. App. 1983).

During the argument of the parties at sentencing, defense counsel "remind[ed] the Court that [the defendant] has already completed four and a half to five months of incarceration[,]" to which the court responded, "Actually, it's just under four months, eight days short of four months." However, from the judgment sheets, it appears that the trial court did not give the defendant any credit for time served. We are unable to determine from the record before us the amount of jail credit to which the defendant is entitled. Therefore, we must remand for the trial court to determine how much jail credit the defendant is entitled to and apply that toward the one-year portion of her sentence to be served in confinement.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentence imposed by the trial court, but we remand for the trial court to determine how much jail credit the defendant is entitled to and apply that to her sentence, entering a new judgment to reflect these credits.

_____
ALAN E. GLENN, JUDGE